**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

JOSE M. LICONA                                               CIVIL ACTION

VERSUS                                                        NO. 19-10502

DARREL VANNOY,                                           SECTION: "M"(3)
WARDEN

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Jose M. Licona, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola Louisiana. On March 21, 2013, Licona was convicted of aggravated rape and sexual battery of a child under Louisiana law.[1] On April 22, 2013, he was sentenced to a term of life imprisonment as to count one and fifty years as to count two, to be served concurrently and without benefit of parole, probation, or suspension of sentence.[2] The Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences on May 21, 2014, but remanded the case for

---

[1] State Rec., Vol. 2 of 6, Trial Transcript, pp. 12-13, 3/21/13; State Rec., Vol. 1 of 6, Trial Minutes, 3/21/13; Verdict, 3/21/13.
[2] State Rec., Vol. 2 of 6, Sentencing Transcript, 4/22/13; State Rec., Vol. 1 of 6, Sentencing Minutes, 4/22/13; State of Louisiana Uniform Commitment Order, 4/22/13.

correction of the Uniform Commitment Order to accurately reflect the dates of the offense and adjudication.[3]  The Louisiana Supreme Court denied his related writ application on April 2, 2015.[4]

Almost nearly a year had passed, Licona filed an application for post-conviction relief with the state district court on April 19, 2016.[5]  That application was denied on July 21, 2016.[6]  His related writ applications were thereafter likewise denied by the Louisiana Fifth Circuit Court of Appeal on June 23, 2017,[7] and the Louisiana Supreme Court on October 29, 2018.[8]

Approximately six and a half months later, Licona then filed the instant federal application seeking habeas corpus relief on May 15, 2019.[9]  The state filed a response contending, *inter alia*, that the application was untimely.[10]  The state alternatively contends that several of Licona's claims are unexhausted and technically procedurally barred without responding to the merits of any claim.[11]  Licona filed a reply arguing that his application should be deemed timely because he was entitled to equitable tolling of the statute of limitations.[12]  For the following reasons, the undersigned rejects Licona's argument and finds that his application was indeed untimely.[13]

---

[3] State v. Licona, 141 So. 3d 333 (La. App. 5th Cir. 2014), reh'g denied (La. App. 5th Cir 7/23/14); State Rec., Vol. 2 of 6.
[4] State v. Licona, 163 So. 3d 791 (La. 2015); State Rec., Vol. 6 of 6.
[5] State Rec., Vol. 1 of 6.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record in this instance, the Court has simply used the signature date of the application as the filing date, in that the application was obviously placed in the mail no earlier than the date it was signed.
[6] State Rec., Vol. 1 of 6, Order, 7/21/16.
[7] State v. Licona, No. 17-KH-313 (La. App. 5th Cir. June 23, 2017); State Rec., Vol. 5 of 6.
[8] State ex rel. Licona v. State, 256 So.3d 977 (La. 2018); State Rec., Vol. 6 of 6.
[9] Rec. Doc. 3.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner has declared under penalty of perjury that his application was placed in the prison mailing system on May 15, 2019.  Rec. Doc. 3-2, p. 16.
[10] Rec. Doc. 7.
[11] Id.
[12] Rec. Doc. 8.
[13] As the undersigned recommends that the habeas application be found to be untimely, she does not address the issue regarding whether Licona exhausted his claims.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final."  28 U.S.C. § 2244(d)(1)(A).[14]  With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).   When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

As noted, the Louisiana Supreme Court denied Licona's direct-review writ application on April 2, 2015.  Therefore, his state criminal judgment became final for AEDPA purposes on July 1, 2015.  As a result, his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

After two hundred ninety-three (293) days elapsed, Licona tolled his federal limitations period in the instant case by filing a post-conviction application with the state district court on April 19, 2016.  Although that application was denied by the district court, it nevertheless remained "pending" for the purposes of § 2244(d)(2) for the duration of the post-conviction proceedings, so

---

[14] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events that can trigger a delayed commencement of the statute of limitations in some circumstances, those alternative provisions are not applicable in the instant case.

long as petitioner continued to seek review at the higher levels of the state court system in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). Here, the state does not argue that Licona's related writ applications were untimely filed; rather, the state appears to concede that tolling continued until the Louisiana Supreme Court denied post-conviction relief on October 29, 2018.[15]  The undersigned agrees.

Once the limitations period then resumed running at that point, Licona had only ninety-four (94) days remaining.  Accordingly, he had only until **September 7, 2017**, either to again toll the limitations period or to file his federal application.

Licona had no other applications pending before the state courts at any time on or before September 7, 2017.  Therefore, he clearly is not entitled to further statutory tolling.

The Court must next consider equitable tolling.  Licona argues that equitable tolling is warranted in his case because he did not receive notice of the Louisiana Supreme Court's decision on his collateral-review writ application in a timely manner after relief was denied on October 29, 2018.  He alleges, and the state appears to concede,[16] that he did not receive actual notice of that decision until March 22, 2019, when he received correspondence from the Louisiana Supreme Court sent in response to his inquiry concerning the status of his case.  Licona argues that his federal application is timely because he is entitled to equitable tolling from the date of the Louisiana Supreme Court's decisions (October 29, 2018) until the date he received notice of those decisions (March 22, 2019).  However, the state argues that equitable tolling is *not* warranted in

---

[15] See Rec. Doc. 7, p. 8.  As the state correctly notes, the limitations period resumed running once the Louisiana Supreme Court denied petitioner's collateral-review writ applications, because a petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

[16] See Rec. Doc. 7, p. 9.

this case because Licona failed to act diligently.  For the following reasons, the undersigned again agrees with the state.

Although the AEDPA's statute of limitations "is subject to equitable tolling in appropriate cases," Holland v. Florida, 560 U.S. 631, 645 (2010), it is nonetheless "unavailable in *most* cases," Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999) (emphasis added).  Specifically, "a petitioner is entitled to equitable tolling *only* if he shows *both* that (1) he has been pursuing his rights diligently, *and* (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (emphasis added; internal quotation marks omitted).  Regarding the two prongs of the Holland test, the United States Supreme Court has explained:

> [W]e have expressly characterized equitable tolling's two components as "elements," not merely factors of indeterminate or commensurable weight.  Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements").  And we have treated the two requirements as distinct elements in practice, too, rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other.  See, e.g., Lawrence v. Florida, 549 U.S. 327, 336-337, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (rejecting equitable tolling without addressing diligence because habeas petitioner fell "far short of showing 'extraordinary circumstances'"); Pace, *supra*, at 418, 125 S.Ct. 1807 (holding, without resolving litigant's argument that he had "satisfied the extraordinary circumstance test," that, "[e]ven if we were to accept [his argument], he would not be entitled to relief because he has not established the requisite diligence").

Menominee Indian Tribe of Wisconsin v. United States, 136 S. Ct. 750, 756 (2016).[17]  Moreover, a petitioner always bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).

The undersigned finds that Licona's failure to receive notice of the Louisiana Supreme Court rulings could in fact qualify as an "extraordinary circumstance."  See, e.g., Williams v.

---

[17] Menominee Indian Tribe was not a habeas corpus case.  However, its equitable tolling discussion is expressly based on the Supreme Court's interpretation of Holland; therefore, the reasoning therein is applicable to habeas cases.  See, e.g., Brian R. Means, Federal Habeas Manual § 9A:83 (2020).

<u>Thaler</u>, 400 F. App'x 886, 892 (5th Cir. 2010) ("Our delayed notice cases demonstrate that the simple fact that a petitioner did not receive notice that the AEDPA limitations period had ceased to toll may be an extraordinary circumstance that warrants equitable tolling.") (citing <u>Phillips v. Donnelly</u>, 216 F.3d 508, 511 (5th Cir.), *reh'g granted and modified in part on other grounds*, 223 F.3d 797 (2000)).  Nevertheless, even so, that is only *half* of petitioner's battle; as noted, he must *also* establish that he pursued his rights *diligently*, because "[e]quity is not intended for those who sleep on their rights."  <u>Mathis v. Thaler</u>, 616 F.3d 461, 474 (5th Cir. 2010) (quotation marks omitted).

Regarding the diligence requirement, it is clear that a petitioner need not show that he exercised the "maximum feasible diligence"; rather, "[t]he diligence required for equitable tolling purposes is *reasonable* diligence."  <u>Holland</u>, 560 U.S. at 563 (emphasis added; quotation marks omitted).  Nonetheless, the undersigned cannot say that petitioner exercised even reasonable diligence in this case for the following reasons.

As an initial matter, it must be noted that Licona did not seek post-conviction relief in the state courts with diligence and alacrity.  On the contrary, although his state criminal judgment became final for AEDPA purposes on July 1, 2015, he nevertheless waited until April 19, 2016, to seek post-conviction relief in the state courts – in other words, he allowed more than *nine months* (or approximately *75%* of his one-year federal limitations period) to elapse before he even began seeking such relief.  In this Circuit, similar delays in seeking post-conviction relief have been considered indicative of a lack of diligence for equitable tolling purposes.  <u>See Schmitt v. Zeller</u>, 354 F. App'x 950, 951-52 (5th Cir. 2009) ("[Petitioner] delayed approximately ten months after his conviction was final before applying for state habeas relief. ... [Petitioner]'s filing the state petition after squandering most of the year available under Section 2244 is a factor in deciding

whether equitable tolling should be allowed for problems that arise in later filing the federal petition."); Nelms v. Johnson, No. 01-10696, 2002 WL 31319277, at *1 (5th Cir. Sept. 30, 2002) ("This court has found no case in which equitable tolling was granted after a petitioner had let ten months of the AEDPA limitations period slip by."); Williams v. Vannoy, Civ. Action No. 1713281, 2019 WL 2469682, at *3 (E.D. La. Jun. 13, 2019) (petitioner was not entitled to equitable tolling for state's delay in notifying him of denial of writs when he did not exercise diligence initially when he waited nearly eleven months to file his initial application for post-conviction relief), appeal filed, No. 19-30523 (5th Cir. Jun. 27, 2019).

Even more importantly, however, Licona then failed to diligently monitor the status of his Louisiana Supreme Court collateral-review application. The record reflects that Licona filed an application with the Louisiana Supreme Court challenging the Court of Appeal's denial of relief on or about July 12, 2017.[18] The first action Licona took to check on the status of the application was on February 13, 2018, seven months later, at which time he advised he did not even have a docket number and was seeking any information available.[19] He was advised by letter dated February 21, 2018, that his writ application was pending and provided a docket number, which letter he received, according to prison mailroom records, on February 23, 2018.[20] He took no further action to check the status of his application until he sent correspondence inquiring about its status until approximately *one year later* on January 22, 2019.[21] Licona sent a third letter on March 13, 2019, in which he requested the status of his case and stated he did not receive a response

---

[18] State Rec., Vol. 6 of 6. The application was accompanied by a "Writ Application Filing Sheet" dated by petitioner on July 12, 2017.
[19] Rec. Doc. 3-2, p. 27.
[20] Id., at pp. 25-26.
[21] Id., at p 28.

to his January 22, 2019 letter.  Thereafter, on March 22, 2019, Licona received a letter advising

that his writ application had been denied on October 29, 2018.[22]

While Licona inquired regarding the status of his case three times, Licona's decision to

wait seven months to inquire about a case number and another eleven months to inquire for a

second time about the status of his case was an unreasonable delay.  As United States Magistrate

Judge Sally Shushan observed in a Report and Recommendation adopted by United States District

Judge Helen "Ginger" Berrigan:

> It is clear that diligence is required of one desiring equitable tolling.  See,
> e.g., Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999).  Further, while this
> Court realizes that incarcerated persons face more obstacles than free citizens in
> making routine status checks on pending court matters, even prisoners are not
> absolved of *all* responsibility to track their litigation diligently.  Accordingly, a
> *habeas* petitioner should not be allowed to avoid the AEDPA's statute of limitations
> indefinitely by making an unreasonable decision to forego even minimal efforts to
> check the status of his litigation with some regularity.

Smith v. Terrell, Civ. Action No. 07-9449, 2009 WL 2139697, at *4 (E.D. La. July 13, 2009).  As

the Smith court went on to say, "In light of the relative brevity of the AEDPA's statute of

limitations and the harsh consequences of filing after its expiration," it is imperative that prisoners

"check the status of their pending matters with some degree of regularity."  Id.  Moreover, "[w]hile

it may be difficult to identify the *exact* point in time at which a petitioner's willingness to idly and

unquestioningly wait for notification of a court's decision crosses the line from being reasonable

to unreasonable, … some such point in time must exist …."  Id.  Whatever that exact point may

be, it is clear that waiting almost a year to make a status inquiry is unreasonable and so does not

warrant equitable tolling.  See, e.g., Stroman v. Thaler, 603 F.3d 299, 302 (5th Cir. 2010) (finding

that an eighteen-month wait between inquiries as to the status of an application was not sufficiently

diligent for equitable tolling);; Hicks v. Quarterman, Civ. Action No. H-06-2208, 2007 WL 79706,

---

[22] Id., at pp. 24, 31.

at *5 (S.D. Tex. Jan. 8, 2007) (lack of diligence where prisoner waited one year to make first inquiry about the status of a filing and another year to make the second inquiry), aff'd, 298 F. App'x 346 (5th Cir. 2008).

Furthermore, even after Licona received notice that the Louisiana Supreme Court had denied his writ application, he waited another 54 days to file his habeas application. See, e.g., George v. Vannoy, 6:17-cv-01614, 2018 WL 1698308, at * 3 (W.D. La. Mar. 6 2018) (petitioner's lack of diligence continued when he waited an additional 32 days between learning of the denial of his state writ and the mailing of his federal habeas petition), report and recommendation adopted, 2018 WL 1661457 (W.D. La. Apr. 6, 2018).

For these reasons, the Court finds that Licona has failed to establish that equitable tolling is warranted in this case.

Finally, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In McQuiggin, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
>
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115

S.Ct. 851; <u>see</u> <u>House</u>, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the <u>Schlup</u> standard is "demanding" and seldom met).

<u>McQuiggin</u>, 569 U.S. at 386.

In the instant case, Licona has not invoked <u>McQuiggin</u>.  However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that he has not made the showing required under <u>McQuiggin</u> for the following reasons.

Licona was convicted of aggravated rape and sexual battery of a  juvenile.  At the time of the offense, Louisiana law defined aggravated rape (now designated first degree rape), in pertinent part, to mean a rape committed where the anal, oral or vaginal intercourse with a person under the age of thirteen years.  La. Rev. Stat. § 14:42(A)(4).  Rape is defined, in pertinent part, as vaginal sexual intercourse with a female person committed without the person's lawful consent.  La. Rev. Stat. 14:41(A).  Under Louisiana law, to prove aggravated rape of a child under 13 years old, the State must prove: (1) anal, oral or vaginal penetration deemed without consent of the victim because of (2) the victim's age at the time of the rape.  <u>State v. Williams</u>, 950 So.2d 126 (La. App. 2d Cir. 2007); <u>State v. Wright</u>, 690 So.2d 850, 856 (La. App. 3d Cir. 1997).  Moreover, "[a]ny penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient."  <u>State v. Anderson</u>, 499 So. 2d 1252, 1253 (La. App. 4th Cir. 1987) (citing, <u>State v. Bertrand</u>, 461 So.2d 1159, 1162 (La. App. 3d 1984), <u>writ denied</u>, 464 So.2d 314 (La. 1985)).  At the time of the offense, La. Rev. Stat. § 14:43.1 provided that sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body when the victim is under the age of thirteen.

A logical starting point is to look at the "old" evidence, i.e. the evidence existing and known at the time of Licona's trial.  Therefore, in assessing a claim of actual innocence, a court normally

first examines the evidence presented at trial and on which the petitioner's conviction was based.

See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27,

2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014

WL 4674673, at *6 (E.D. La. Sept. 17, 2014).  In the instant case, the Louisiana Fifth Circuit Court

of Appeal summarized that evidence as follows:

> On the afternoon of July 10, 2011, J awoke from a nap and heard her five-year-old daughter, M, tell Defendant, J's live-in boyfriend, that she was bleeding.[1] Upon putting M in the bathtub, J pulled down M's pants and noticed she was bleeding.  When J asked M why she was bleeding, M kept saying she did not know.  J saw clots of blood coming out, at which time she and Defendant took M to East Jefferson General Hospital (EJGH).  M was subsequently transferred from EJGH to Children's Hospital via ambulance.
>
> [1]Initials are used under the authority of La. R.S. 46:1844(W)(3), which allows the Court to identify a crime victim who is a minor or a victim of a sex offense by using his or her initials.  Further, this Court has adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (i.e., parent, sibling, or relative with the same last name as the victim).  See State v. E.J.M., III, 12–774 (La. App. 5 Cir. 5/23/13); 119 So.3d 648, 652, n.1.  Compare State v. R.W.B., 12–453 (La.12/4/12); 105 So.3d 54.
>
> Once at Children's Hospital, M was evaluated by Dr. Jamie Jackson, a forensic pediatrician with the Audrey Hepburn Care Center at Children's Hospital.  Dr. Jackson was called to consult on the case because of concerns for sexual abuse due to M's unexplained vaginal bleeding.  After obtaining M's basic medical history from J, Dr. Jackson asked J and Defendant to leave the room so she could speak to M privately.  When Dr. Jackson asked M what happened, M stated that her "dad" hurt her.[2]  She told Dr. Jackson that her "dad" put his thing "here" and pointed to her front middle vaginal area and her butt.  M also indicated that her "dad" played with her vaginal area with his finger.  After Dr. Jackson talked to M, M was taken to surgery so her injuries could be fully assessed and evidence could be collected.
>
> [2]J testified that M started calling Defendant "Daddy" after her 10–month-old daughter that she had with Defendant was born.  J clarified that Defendant is not M's biological father.
>
> Prior to surgery, M was examined by Dr. Kurt Eeg, a pediatric urologist.  He noted that M had blood stains on her inner thighs, a clot where the vagina and urethra are located, and a small tear in the 7:00 position.  In surgery, Dr. Eeg determined that M had a complete laceration, or a deep cut, along the entire length of her vagina and along the posterior wall of the vagina.  Dr. Eeg believed he could see M's bowels, indicating the tear went into M's peritoneal cavity, and had to consult with a general surgeon on how to repair the injury.  Both Dr. Jackson, who

was present during the surgery to take photographs and collect evidence,[3] and Dr. Eeg testified that M's injuries were consistent with penetrating trauma, such as penile/vaginal penetration.

[3]No DNA was identified from the rape kit. Dr. Jackson gave possible explanations for the lack of DNA, citing the extensive amount of bleeding, the wiping of the blood, the fact M had urinated since the incident, and the fact M had been put into a bath after the incident and prior to the collection of evidence.

At approximately 8:30 p.m., Officer Michael Jackson with the Kenner Police Department was dispatched to Children's Hospital regarding a possible aggravated rape.[4] After speaking with Dr. Jackson, Officer Jackson contacted his supervisor and then spoke with Detective Charlotte Synigal, who was assigned as the lead investigator on the case. Pursuant to Det. Synigal's instructions, Officer Jackson separated J and Defendant until Det. Synigal arrived.

[4]Defendant lived with J and M in an apartment located in Kenner.

Upon Det. Synigal's arrival, Dr. Jackson gathered the Detective, J and a worker with child protective services, and disclosed what M had told her about what had happened. Det. Synigal then spoke with Defendant, who agreed to go to the police department to further discuss the matter. Thereafter, Det. Synigal was able to meet with M in the surgery recovery area, at which time M provided information consistent with that given by Dr. Jackson.

Early in the morning on July 11, 2011, Det. Synigal subsequently went to the police department, where she met with Defendant and advised him of his rights. Defendant waived his rights, and Det. Synigal proceeded to interview him. During the interview, Defendant indicated that he and J were the only people who cared for M. He suggested to Det. Synigal that M might have caused the injury herself by inserting something into her vaginal cavity. According to Det. Synigal, when she told Defendant that M said he had vaginally and anally raped her and showed him Dr. Jackson's report, Defendant "just kind of laughed and ... said that can't be right, there has to be some other explanation for this." When Det. Synigal specifically asked if M was lying, Defendant replied "no." Det. Synigal ended the interview once Defendant started laughing and she knew the interview would not progress any further. Defendant was subsequently arrested and transported to the jail.

Later that same day, Defendant agreed to talk with Det. Synigal, and gave two recorded statements. In his first statement, Defendant referred to M as his daughter. The statement was stopped shortly after it began when Defendant indicated he needed to use the restroom. After a break, Defendant gave a second statement in which he made inculpatory statements. Specifically, Defendant apologized for not previously telling the truth about the incident, asked God's forgiveness for what he had done, admitted that he "must have been the person who did that to her," that he must have done everything that M and the doctors said, and that he was there to "take responsibility" for what he had done.

Meanwhile, a search warrant had been obtained and was executed at the Kenner apartment where Defendant, J and M lived. Various items and clothing had been seized, including bloodied underwear. A day or two after the search, J called

the police to report that she had found a t-shirt and a pair of men's grey boxers balled up inside a towel in the laundry room. J stated these clothes belonged to Defendant. The police collected these items from the apartment and performed DNA testing on the boxers, which appeared to have blood stains on them.

The DNA test results showed that there was a mixture of more than one individual's DNA on the boxer shorts. The DNA test results showed that M could not be excluded as a major donor to the DNA mixture, but Defendant was excluded as a possible donor. Further DNA testing, specifically an amplified test for Y chromosome testing, was conducted on the DNA mixture and revealed that Defendant and all males within his paternal lineage could not be excluded as a possible donor of the DNA mixture found on the boxer shorts.

Ten days after the incident, on July 20, 2011, M was interviewed by Suzanne Jolissaint, a forensic interviewer at the Jefferson Children's Advocacy Center (CAC). This videotaped interview was played for the jury. During the interview, M stated that "Manuel" had hurt her and had put his "thing" in her "pee part" and "butt." When asked to identify Defendant's "thing" on a body diagram of an adult male, M circled the front middle part of male's pants, between the legs. She also stated that "Manuel" put his finger in her "pee part." She again circled the finger on the body diagram of the adult male. M further stated that "Manuel" licked her "pee part" with his tongue. M explained this happened in her mother's bedroom on the bed while her mother was downstairs on the couch.

At trial, M, who was six years old, had great difficulty testifying. However, she was able to testify that she went to the hospital because she "got hurt." She stated that she told the truth to the doctors at the hospital. M was shown the body diagrams from her CAC interview, and she explained that she circled the parts on the girl diagram where she was hurt. M identified Defendant in court as the person who hurt her.[23]

The foregoing "old evidence" was obviously compelling evidence of guilt, and so petitioner would face a daunting burden to present a credible "actual innocence" claim. Specifically, the United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is required "to support his allegations of constitutional error with new reliable evidence – *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995) (emphasis added).

---

[23] State v. Licona, 141 So. 3d 333, 337-339 (La. App. 5th Cir. 2014); State Rec., Vol. 2 of 6.

In the instant case, there was obviously ample evidence of Licona's guilt introduced at trial, and he has presented no new evidence whatsoever, much less any evidence of the type or caliber referenced in Schlup, to show that he is actually innocent. Therefore, he cannot meet "the threshold requirement" for McQuiggin to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329). Accordingly, McQuiggin does not aid him.

The Court notes that Licona claims that he was intoxicated at the time of the offenses. However, in his own statement to police, which was played for the jury, Licona admitted to having been drinking before the incident, but he also repeatedly denied being intoxicated.[24] Furthermore, J.H. testified at trial that no one had been drinking, and Detective Synigal testified that she saw no indication that either Licona or J.H. were under the influence of alcohol.[25] Moreover, Louisiana law provides that both aggravated rape and sexual battery are general intent crimes, and, as such, voluntary intoxication is not an available defense. Franklin v. Warden Louisiana State Penitentiary, No. 06-CV-0151, 2008 WL 5109742, at *8 (W.D. La. Nov. 6, 2008) (noting that aggravated rape is a general intent crime and voluntary intoxication is a defense to only specific intent crimes); State v. Martin, No 2014 KA 0295, 2014 WL 4668768, at *2 (La. App. 1st Cir. Sept. 19, 2014) (defendant was not entitled to use voluntary intoxication as a defense to aggravated rape as it is a general intent crime); State v. Taylor, 802 So.2d 779, 783 (La. App. 5th Cir. 2001) (aggravated rape is a general intent crime); State v. Hurst, 606 So.2d 965, 968 (La. App. 3d Cir. 1992); State v McDaniel, 515 So.2d 572, 575 (La. App. 1st Cir. 1987); State v. Stevenson, 908

---

[24]State Rec. Vol. 5 of 6, Kenner Police Department Criminal Investigations Divisions Transcription Report, pp. 10-11, 16, 19, 2, 25, 28-29, 7/11/11; State Rec. Vol. 3 of 6, Trial Transcript, pp. 194-, 196-197, 3/19/13.
[25] State Rec. Vol. 2 of 6, Trial Transcript (con't), pp. 42-43, 49, 3/20/13.

So.2d 48, 53 (La. App. 5th Cir. 2005) (sexual battery requires general intent, thus Stevenson's intoxication was irrelevant).

Licona also claims that someone could have broken into the house and committed the crime.  This claim is pure speculation and petitioner presents no evidence to support his claim. For these reasons, simply Licona has not made a colorable showing that he is actually innocent in light of "new evidence."

Because Licona is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that he is actually innocent, his federal application for habeas corpus relief had to be filed no later than **January 9, 2019**, in order to be timely.  His application was not filed until **May 15, 2019**, and, therefore, it was untimely.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Jose M. Licona be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>,

79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this  1st  day of July, 2020.


**DANA M DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

16